State v. Bonvie (2005-560 & 2006-096)

2007 VT 82

[Filed 24-Aug-2007]


 NOTICE: This opinion is subject to motions for reargument under
 V.R.A.P. 40 as well as formal revision before publication in the Vermont
 Reports. Readers are requested to notify the Reporter of Decisions,
 Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801 of
 any errors in order that corrections may be made before this opinion goes
 to press.

 2007 VT 82

 Nos. 2005-560 & 2006-096


 State of Vermont Supreme Court

 On Appeal from
 v. District Court of Vermont,
 Unit No. 3, Caledonia Circuit

 Christopher Bonvie February Term, 2007

 State of Vermont Supreme Court

 On Appeal from
 v. District Court of Vermont,
 Unit No. 1, Windham Circuit

 Adam Gilbeau December Term, 2006

 Amy M. Davenport, J. (05-560)
 Katherine A. Hayes, J. (06-096)

 Robert Butterfield, Caledonia County State's Attorney, St. Johnsbury, for
 Plaintiff-Appellant (05-560).

 Stuart G. Schurr, Department of State's Attorney, Montpelier, for
 Plaintiff-Appellant (06-096).

 David C. Sleigh of Sleigh & Williams, St. Johnsbury, for Defendant-Appellee
 (05-560).

 William E. Kraham of Weber, Perra & Munzing, P.C., Brattleboro, for
 Defendant-Appellee (06-096.)


 PRESENT: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

 
 ¶ 1. DOOLEY, J. Defendants, Christopher Bonvie and Adam Gilbeau,
 were separately arrested for driving under the influence (DUI). Each man
 received a citation for "DUI/Refusal" based on the arresting officer's
 determination that he had refused the test. In each defendant's
 license-suspension hearing, the district court disagreed, concluding that
 defendant had not refused, or even if he had, his subsequent request to
 take the test cured his initial refusal. We consolidate these
 substantially identical appeals by the State and affirm. We hold that
 subsequent, good-faith consent to take a breathalyzer test negates an
 earlier refusal if the consent is given within the statutory thirty-minute
 window to contact an attorney that 23 V.S.A. § 1202(c) provides, subject to
 the factors outlined in Standish v. Department of Revenue, 683 P.2d 1276,
 1280 (Kan. 1984), discussed herein. 

 ¶ 2. The stories of the two arrests are largely the same. Defendant
 Bonvie, age nineteen at the time, was stopped for failing to obey a stop
 sign. Based on roadside observations, the arresting officer concluded that
 he had probable cause to believe defendant was driving under the influence
 of alcohol and transported him to the police station for processing. The
 officer read him his rights regarding the breathalyzer test, including the
 provision that his privilege to drive could be suspended for at least six
 months if he refused to take the test. At defendant's request, the officer
 contacted a lawyer, and when defendant's conversation with the lawyer
 concluded, the officer returned to the room and asked if defendant would
 submit to the test. Defendant responded that his lawyer told him not to
 answer any questions. 
 
 ¶ 3. The following exchange ensued - The officer: "Well, are you
 going to provide a sample of your breath?" Defendant Bonvie: "I guess no." 
 The officer: "Is that a no?" Defendant: "No." The officer concluded that
 defendant had declined to take the test and handed him his civil-
 suspension paperwork. Upon looking at it, defendant asked why his license
 would be suspended for six months, and the officer explained it was because
 he had declined to take the test. At that point defendant asked if he
 could take the test, and the officer refused. The trial court found, and
 the State does not contest, that just under thirty minutes elapsed between
 the initial attempt to contact an attorney and defendant's request to take
 the test.
 
 ¶ 4. Defendant Gilbeau was approached by an officer who saw smoke
 and tire-marks coming from his parked vehicle. The vehicle was still
 running, and its two right tires were lodged on the curb in front of a pub. 
 The officer informed defendant of his rights regarding the breath test;
 defendant chose not to speak with an attorney. When asked if he would
 submit to a test, defendant said "no." When defendant saw the paperwork
 citing him for "DUI/Refusal," however, he told the officer that he
 misunderstood and explained that he thought he was being asked to agree
 that the breath test could be used as evidence against him in court. 
 Although he would not agree to that, he stated that he would submit a
 sample of his breath for an evidentiary test. The officer refused to give
 him the test. Defendant testified at his civil suspension hearing that
 "immediately" after realizing the officer believed he had declined the
 test, he asked to take it, but the officer refused. (FN1) 
 
 ¶ 5. In each case, the district court noted that defendant had
 been "cooperative and polite throughout the processing." Each court
 concluded that a defendant's subsequent request to take a breathalyzer test
 may cure his initial refusal if he changes his mind within a reasonable
 time and if the State is not unreasonably burdened by the request. 
 Specifically, the Caledonia District Court, Judge Davenport presiding, held
 that defendant Bonvie had not "refused" because he subsequently requested
 to take the test within the thirty minutes provided by statute. See 23
 V.S.A. § 1202(c) ("The person must decide whether or not to submit to the
 evidentiary test or tests within a reasonable time and no later than 30
 minutes from the time of the initial attempt to contact the attorney."). 
 The Windham District Court, Judge Hayes presiding, did not expressly
 address whether defendant Gilbeau had "refused" to take the test, but
 instead adopted the five-part test of the Kansas Supreme Court that later
 consent to evidentiary testing cures an initial refusal if made:

 (1) within a very short and reasonable time after the prior first
 refusal;
 (2) when a test administered upon the subsequent consent would
 still be accurate;
 (3) when testing equipment is still readily available;
 (4) when honoring the request will result in no substantial
 inconvenience or expense to the police; and 
 (5) when the individual requesting the test has been in the
 custody of the arresting officer and under observation for the
 whole time since arrest. 

 Standish, 683 P.2d at 1280. The court found that all five factors were
 met in Gilbeau's case, and there was no allegation that defendant Gilbeau's
 request to take the test was made more than thirty minutes after he was
 informed of his right to consult with counsel. Both judges concluded that
 the State had not met its burden of showing a refusal, and thus entered
 judgment for defendant at the civil suspension hearing. Judge Hayes held
 that all evidence of defendant Gilbeau's "refusal" would be suppressed at
 trial. The State appealed. 

 ¶ 6. Whether, and in what circumstances, a defendant may cure an
 initial refusal to take a chemical test is a question of law that we review
 de novo under our implied-consent statute. See Wright v. Bradley, 2006 VT
 100, ¶ 6, ___ Vt. ___, 910 A.2d 893 ("Issues of statutory interpretation
 are subject to de novo review."). We begin with the relevant Vermont
 authority, but because our prior decisions do not resolve the matter
 conclusively, we proceed to examine the holdings of courts in other
 jurisdictions that have addressed the issue. 
 
 ¶ 7. We look first to the statute. Section 1202 of Title 23
 concerns "consent to taking of tests to determine blood alcohol content"
 generally. Subsection (a)(1), Vermont's "implied consent" law, states
 that the driver or person "in actual physical control of any vehicle on a
 highway in this state is deemed to have given consent to an evidentiary
 test of [their] breath for the purpose of determining the person's alcohol
 concentration or the presence of other drug in the blood." Refusal to
 take the test when an officer has "reasonable grounds to believe" the
 operator is in violation of § 1201 is sanctioned by an automatic six-month
 suspension of the operator's license, 23 V.S.A. § 1205(a), and by making
 the refusal admissible as evidence of guilt in a criminal proceeding, §
 1202(b). Accordingly, the statute further requires that operators receive
 a series of warnings upon being asked to take the test, including a warning
 that refusal will result in a six-month license suspension, id. §
 1202(d)(2), that evidence of the refusal is admissible in a criminal
 proceeding, id. § 1202(d)(6), and that the individual has the right to
 consult with an attorney before deciding whether to take the test. id. §
 1202(d)(4). The operator must decide whether to take the test "within a
 reasonable time and no later than 30 minutes from the time of the initial
 attempt to contact the attorney . . . regardless of whether a consultation
 took place." Id. § 1202(c). (FN2) 
 
 ¶ 8. We agree with the State that the plain language of the above
 provisions does not necessarily afford an individual the right to "change
 his mind" about taking a breath test within the thirty-minute window. On
 the other hand, nothing in the statute expressly precludes later consent
 after an initial refusal. Here, we are mindful of our repeated conclusion
 that § 1202(c) "evidences the [L]egislature's 'concern that any refusal to
 be tested [shall] not be lightly decided, by providing for counsel and for
 time for reflection.' " State v. Kozel, 146 Vt. 534, 538, 505 A.2d 1221,
 1223 (1986) (quoting State v. Carmody, 140 Vt. 631, 636, 442 A.2d 1292,
 1295 (1982)). We have also recognized the Legislature's general
 encouragement of breath tests through its conditioning of motor-vehicle
 licenses on an operator's implied consent to take such tests. Veilleux v.
 Springer, 131 Vt. 33, 39, 300 A.2d 620, 624 (1973) (explaining legislative
 encouragement of "the availability of scientific evidence" through implied
 consent law). More broadly, in concluding under a previous version of the
 implied-consent law that individuals must be informed of their right to
 consult with an attorney before deciding whether to take the test, we
 recognized the many criminal and civil ramifications of this decision, and
 held that such a "complicated decision" should be made with the option of
 receiving the advice of counsel, or else not be binding. See Duff, 136 Vt.
 at 539-40, 394 A.2d at 1146. In doing so, we construed the statute
 liberally "in accordance with the nature of the right it affords." Id. at
 540, 394 A.2d at 1146.

 ¶ 9. We have dealt at least three times before with DUI defendants
 who responded ambiguously to requests to take a breath test. In State v.
 Benware, the question was whether the defendant had refused the test when
 he offered to take it after the officer made "five attempts to administer
 the test over a period of forty-one minutes." 165 Vt. 631, 632, 686 A.2d
 478, 479 (1996) (mem.). During that time, the defendant "forced numerous
 burps while repeatedly making obnoxious comments and gestures" to the
 officer. Id. We noted that the defendant had "deliberated beyond the
 thirty-minute statutory time limit imposed by 23 V.S.A. § 1202(c)," but we
 declined to resolve the matter on that ground, instead affirming on the
 basis that his "stated change of mind was not genuine." Id. at 632, 686
 A.2d at 480. We stated that 23 V.S.A. § 1202(c) "provides a defendant with
 a reasonable amount of time to decide whether to submit to the breath test,
 but no longer than thirty minutes after the first attempt to contact an
 attorney." Id. at 632, 686 A.2d at 479.
 
 ¶ 10. We similarly left open the question of "how processing
 officers ought to respond to good faith and timely changes of mind" with
 respect to a request to take a breathalyzer test in State v. Lynaugh, 148
 Vt. 124, 127, 530 A.2d 555, 558 (1987). There, the defendant expressly
 refused to take the test twice, was described as "difficult and arrogant"
 during his processing, and ultimately asked a second officer to administer
 the test more than thirty minutes after the first officer had arranged
 contact with an attorney. See id. at 126, 530 A.2d at 557. In these
 circumstances, we affirmed the trial court's finding that the defendant had
 refused to take the test. Id. at 127, 530 A.2d at 558.


 ¶ 11. Finally, Stockwell v. District Court of Vermont, involved an
 "offensive, insulting, . . . abusive . . . and at times," and "physically
 combative" DUI arrestee, therein the plaintiff, 143 Vt. 45, 47, 460 A.2d
 466, 467 (1983), who "would not give any clear verbal expression of either
 consent or refusal" to the breath test. Id. at 48, 460 A.2d at 467. The
 attorney contacted for the plaintiff by the officer indicated to the police
 that he did not recommend that plaintiff take the test. Id. The officers
 concluded nineteen minutes after the lawyer had been contacted that the
 plaintiff's actions indicated a refusal. Id. In response to his argument
 that he was wrongly deprived of his thirty minutes to decide, we stated the
 following:

 Plaintiff had a reasonable time to decide whether to submit to
 testing. It is true that the time does not terminate conclusively
 against a suspect's interests as a matter of law until the thirty
 minutes have elapsed following the initial attempt to contact the
 attorney unless he refuses before the period has run. However,
 this is a remote cousin indeed from the proposition urged by
 plaintiff that a reasonable time can never terminate prior to the
 running of the period. . . . The statutory reasonable time is
 tolled either by the expiration of the thirty minutes or by a
 reasonably clear refusal to submit to the test, whichever occurs
 first in time. Accordingly, we hold that the statutory thirty
 minutes is the maximum reasonable time, not the minimum. 

 Id. at 49-50, 460 A.2d at 468. 
 
 ¶ 12. While informative, the above case law does not dispose of the
 issue before us. Benware and Lynaugh, cases in which the defendants'
 changes of mind were not in good faith and were outside of the
 thirty-minute period, are consistent with a rule that good-faith changes of
 mind to consent to the test, if made within the thirty minutes afforded by
 23 V.S.A. § 1202(c), are permissible. As for Stockwell, although
 particular language in the decision could suggest otherwise, we do not
 conclude that the decision as a whole points in the opposite direction.

 ¶ 13. Stockwell was an interpretation of what is "reasonable" as
 that term is used in the timing provision of the implied-consent statute,
 23 V.S.A. § 1202(c). 143 Vt. at 49, 460 A.2d at 468. It was not a case
 involving a good-faith change of heart; indeed, Mr. Stockwell "showed not
 the slightest indication that he was giving any serious consideration to
 the request made of him several times." Id. at 51, 460 A.2d at 469. He
 was abusive to the point of being "physically combative" and was
 "uncooperative from the outset and never changed." Id. at 47, 51, 460 A.2d
 at 467, 469. Moreover, he argued that he was entitled to at least thirty
 minutes to make a decision on whether to take the test; defendants make a
 very different argument here. We need not disturb our conclusion in
 Stockwell that it was reasonable in those circumstances for the officers to
 conclude that Mr. Stockwell had impliedly but unequivocally refused the
 test before the statutory period had run. Id. at 51, 460 A.2d at 469. In
 contrast, defendants in the cases at bar exhibited precisely the sort of
 cooperation and good faith consideration of the breath test we seek to
 encourage. See Kozel, 146 Vt. at 538, 505 A.2d at 1223 (describing "time
 for reflection" in implied-consent law as indicative of legislative concern
 that refusal not be decided "lightly"). Cf. Schroeder v. Dep't of Motor
 Vehicles & Pub. Safety, 772 P.2d 1278, 1280 (Nev. 1989) (per curiam) ("One
 who is lawfully under arrest for drunk driving should not be able to defeat
 the purpose of the implied consent statutes by being uncooperative with the
 arresting officers."). 
 
 ¶ 14. We conclude that the issue before us is determined neither by
 the specific wording of the refusal statute nor by our precedents. 
 Therefore, we are again in the situation we found ourselves in Duff and
 must construe the statute in light of the right it affords, as we did in
 Duff. See Duff, 136 Vt. at 540, 394 A.2d at 1146. In doing so, we turn to
 the approaches taken in other jurisdictions for guidance. 
 
 ¶ 15. A cross-country review reveals a surprising volume of
 litigation on the topic, with two primary lines of cases. One provides
 that an operator may effectively agree to take the test after an initial
 refusal - the so-called "flexible" approach. See Lund v. Hjelle, 224
 N.W.2d 552, 557 (N.D. 1974) (subsequent consent valid if made within
 reasonable time, test would still be accurate, equipment still readily
 available, no substantial inconvenience or expense to police, and
 individual in police custody continuously since arrest); Pruitt v. Dep't of
 Pub. Safety, 825 P.2d 887, 894 (Alaska 1992) (adopts Lund factors); Gaunt
 v. Motor Vehicle Div, 666 P.2d 524, 528 (Ariz. Ct. App. 1983) (subsequent
 consent honored if defendant still in custody, no substantial inconvenience
 for police, testing equipment still available, and test results still
 accurate); Zahtila v. Motor Vehicle Div., 560 P.2d 847, 849 (Colo. Ct. App.
 1977) (subsequent consent valid if officer still available and delay does
 not materially affect test results); Larmer v. Dep't of Highway Safety &
 Motor Vehicles, 522 So. 2d 941, 944 (Fla. Dist. Ct. App. 1988) (retraction
 of initial refusal valid if given moments later, while still in continuous
 presence of officer, and if no inconvenience would result); Dep't of Pub.
 Safety v. Seay, 424 S.E.2d 301, 302 (Ga. Ct. App. 1992) (adopts Standish
 factors, supra); State v. Moore, 614 P.2d 931, 935 (Haw. 1980) (adopts Lund
 factors); Pangburn v. State, 857 P.2d 618, 620 (Idaho 1993) (subsequent
 consent valid if individual still in police custody, testing equipment and
 personnel "reasonably" available, and delay will not materially affect test
 result); Standish, 683 P.2d at 1280 (factors supra); Pickard v. Dep't of
 Pub. Safety, 572 So. 2d 1098, 1101 (La. Ct. App. 1990), (adopts Moore,
 supra); In re Suazo, 877 P.2d 1088, 1096 (N.M. 1994) (adopts Lund factors,
 supra, with stricter temporal standard); Baldwin v. State ex rel. Dep't of
 Pub. Safety, 849 P.2d 400, 406 (Okla. 1993) (adopts Standish factors). 
 
 ¶ 16. The other concludes that an operator may not subsequently
 consent after a previous refusal - the so-called "absolute" approach. See,
 e.g., Zidell v. Bright, 71 Cal. Rptr. 111, 113 (Ct. App. 1968) (police
 need not arrange for belated test once defendant had "refused to submit
 after fair warning of the consequences"); People v. Shorkey, 321 N.E.2d 46,
 48 (Ill. Ct. App. 1974) (adopts bright-line rule that, where all statutory
 requirements met, refusal to take breath test is binding and cannot be
 nullified by subsequent consent); Hoffman v. Dep't of Transp., 257 N.W.2d
 22, 26 (Iowa 1977) ("One refusal is determinative."); Humphries v.
 Commonwealth, 807 S.W.2d 669, 670 (Ky. Ct. App. 1991) (subsequent testing
 cannot cure initial refusal, which is a violation of statute); State v.
 Landry, 428 A.2d 1204, 1206 (Me. 1981) ("Once an arrestee voluntarily
 refuses a reasonable opportunity to elect a chemical test, the police need
 not go out of their way to coddle a later change of mind."); Blanchard v.
 Dep't of Revenue, 844 S.W.2d 589, 590-91 (Mo. Ct. App. 1993) ("Subsequent
 conduct indicating an agreement to submit is irrelevant even in a case such
 as this, where petitioner asserts he had an 'immediate change of heart.'
 "); Hunter v. State, 869 P.2d 787, 790 (Mont. 1994) ("We restate the rule
 that, in Montana, subsequent consent does not cure a prior refusal to
 submit to a blood alcohol test."); Wisch v. Jensen, 379 N.W.2d 755, 758
 (Neb. 1986) (summarizing previous holding that subsequent offer to take
 test does not cure initial refusal and noting that in instant case,
 technician was already leaving when defendant changed his mind); Schroeder,
 772 P.2d at 1280 ("[W]e reject [defendant's] contention that his eventual
 request to take a chemical sobriety test vitiated his prior refusals.");
 Harlan v. State, 308 A.2d 856, 859 (N.H. 1973) (rejecting subsequent
 consent one hour after initial refusal, but leaving open question when
 defendant "almost immediately" retracts refusal); State v. Bernhardt, 584
 A.2d 854, 858 (N.J. Super. Ct. App. Div.) (adopting "bright line rule . . .
 which precludes a defendant from curing a refusal"); Leviner v. Dep't of
 Hwys. & Pub. Transp., 438 S.E.2d 246, 248 (S.C. 1993) (adopts bright line
 rule); Baker v. Schwendiman, 714 P.2d 675, 677 (Utah 1986) (per curium)
 (where officer "spent approximately thirty minutes attempting to persuade
 plaintiff to submit to a test," and where consent came fifteen to twenty
 minutes later "after the intoxilyzer machine had been shut down," consent
 did not cure refusals); Dep't of Licensing v. Lax, 888 P.2d 1190, 1193
 (Wash. 1995) (adopts bright-line rule). 

 ¶ 17. As the above summary demonstrates, the two lines of cases are
 not nearly straight; some in the "absolute" jurisdictions are consistent
 with those in the "flexible" camp, and vice versa. Compare, e.g.,
 Standish, 683 P.2d at 1280 ("flexible" case requiring continuous custody by
 "arresting officer" and ready availability of testing equipment for later
 consent to be valid), with Schroeder, 772 P.2d at 1280 ("absolute" case
 prohibiting later consent after arresting officer had left), and Baker, 714
 P.2d at 677 ("absolute" case prohibiting later consent after testing
 equipment was shut down); see also Baldwin, 849 P.2d at 405 (recognizing
 difficulty in "artificially categorizing jurisdictions as two separate
 camps"). The statute in place in North Carolina most resembles our own in
 that it provides operators a thirty-minute period to contact an attorney to
 decide whether to take the test. North Carolina is commonly called an
 "absolute" jurisdiction, but its holdings that refusal cannot be
 reconsidered involve consent given outside the thirty-minute period. See 
 Etheridge v. Peters, 269 S.E.2d 133, 136 (N.C. 1980) (finding willful
 refusal to submit to test after statutory thirty-minute period had
 expired); Seders v. Powell, 259 S.E.2d 544, 548-50 (N.C. 1979) (same). 
 These cases do not make clear whether an operator may reconsider a refusal
 within the thirty-minute period. 
 
 ¶ 18. The many courts that allow operators to reconsider a refusal
 coalesce around two rationales: (1) fairness to the operator, and (2)
 furthering the purpose of implied-consent statutes by encouraging the
 administration of chemical tests in as many cases as possible. See, e.g.,
 Gaunt, 666 P.2d at 527 (recognizing clarity afforded by absolute rule, but
 concluding that "it could lead to unnecessarily harsh and self-defeating
 results"); Moore, 614 P.2d at 935 ("We . . . decline to hold with a rule of
 law which would rigidly and unreasonably bind an arrested person to his
 first words spoken, no matter how quickly and under what circumstances
 those words are withdrawn."); In re Smith, 770 P.2d 817, 821 (Idaho Ct.
 App. 1989) (concluding that flexible rule "better serves the public
 interest in obtaining scientific information about the blood-alcohol levels
 of motorists accused of driving under the influence"); Standish, 683 P.2d
 at 1280 ("We believe that the administration of the test should be
 encouraged and the person arrested should be given every reasonable
 opportunity to submit to it."); Lund, 224 N.W.2d at 557 (recognizing that
 because "accuracy of a chemical test under [the implied consent law] does
 not depend upon its being administered immediately after an arrest . . . a
 delay for a reasonable period of time while an arrested person considers or
 reconsiders a decision" to take a test "will not frustrate" objective of
 law); Baldwin, 849 P.2d at 405-06 ("Arresting officers apparently recognize
 that the circumstances of the arrest along with the altered mental state of
 a drunk driver could result in an initially rash decision, which a few
 minutes of reflection by a ride to a jail in a patrol car could correct."). 
 As the U.S. Supreme Court has acknowledged, evidence from a chemical test
 is preferable because "the inference of intoxication arising from a
 positive blood-alcohol test is far stronger than that arising from a
 refusal to take the test." South Dakota v. Neville, 459 U.S. 553, 564
 (1983). 
 
 ¶ 19. Two different rationales also emerge from the "absolute"
 jurisdictions: a desire to obtain the best possible evidence, and a concern
 that allowing conditional refusals would require officers to remain
 available for unreasonable periods to accommodate a change of heart. See,
 e.g., Zidell, 264 Cal. App. 2d at 870 ("It would be inconsistent with the
 purpose of the statute to hold that [the officers] were required to turn
 aside from their other responsibilities and arrange for administration of a
 belated test . . . once appellant had refused to submit after fair warning
 of the consequences."); Humphries, 807 S.W.2d at 670 ("Subsequent testing
 [cannot] cure a violation of the statute, if it could, then delays in
 testing would increase so bloodstream alcohol levels could deteriorate, and
 accurate evidence samples could no longer be obtained."); Bernhardt, 584
 A.2d at 858 (adopting bright-line rule, stating that otherwise police would
 have to "wait for an indefinite period in an attempt to be able to refute a
 defendant's assertion that although he or she changed his or her mind and
 consented within a reasonable time, the police improperly disallowed a
 cure"); Lax, 888 P.2d at 1193 ("If a refusal can be withdrawn or negated,
 the drunk driver has a tool which could be used to manipulate the officer
 and gain extra time. . . . This individualized consideration may take time
 more profitably spent dealing with other, perhaps more urgent tasks.").

 ¶ 20. We generally find the rationale for the flexible rule more
 compelling, in part because we can apply standards that respond to the
 objections stated in the "absolute" cases. Thus, we adopt the flexible
 rule subject to the Standish standards as discussed and modified below.
 
 ¶ 21. We are particularly persuaded by the desire to obtain the
 best evidence, which all would agree is the test result. The Vermont
 implied consent-law "encourages the availability of scientific evidence to
 make . . . a determination [of impairment]." Veilleux, 131 Vt. at 39, 300
 A.2d at 624. As already noted, a test result over the statutory limit is
 much stronger evidence of impaired operation than is the refusal to take
 the test. Neville, 459 U.S. at 564. In general, it is also more
 definitive evidence than the signs of intoxication and impaired operation
 that an officer might observe. For this reason, the Legislature has
 adopted alternative definitions of the crime, one with the main element of
 the crime measured solely by the test result. 23 V.S.A. § 1201(a)(1).
 ¶ 22. We recognize that obtaining the best evidence is also a goal
 of the "absolute" rule because the accuracy of the test in measuring
 alcohol concentration at the time of operation declines over time, such
 that administration of a test as soon as possible after operation is
 desirable. By definition, a test administered after an initial refusal
 will occur later than if the operator had consented in the first instance. 
 But the issue should not turn solely on the timing of consent. Instead the
 choice we face is between imposing an arbitrary sanction for refusal and
 obtaining a test result that shows the extent of the operator's impairment
 at the time the test is administered. Faced with this choice, we favor
 obtaining the test result if it remains sufficiently accurate to show
 impairment at the time of operation. 

 ¶ 23. Consistent with this choice, we have held that breathalyzer
 evidence taken "nearly two hours after the operation of the vehicle" may be
 admissible when the results are appropriately related back by an expert
 witness. State v. Gray, 150 Vt. 184, 187, 552 A.2d 1190, 1192 (1988). In
 most instances, testing is proper only if completed within the period
 clearly defined by 23 V.S.A. § 1202(c). Our decision in this case in no
 way erodes the clear standard set forth by § 1202(c). Instead, in adopting
 a flexible rule, we are guided by flexible language that is present both in
 Gray and 23 V.S.A. § 1204(a)(3), which allows a permissive inference that a
 test result of .10 or greater within two hours of operation shows operation
 under the influence of alcohol.
 
 ¶ 24. We are aided in ensuring the accuracy of the test result by
 the thirty-minute statutory time limit from the time the first attempt to
 contact a lawyer is made. The Legislature has decided that a test within
 the statutory time limit provides a sufficiently accurate indication of
 impairment at the time of operation. This judgment is consistent with
 experience from around the country. See Pickard, 572 So. 2d at 1100
 (flexible rule recognizes "although blood-alcohol levels vary over time,
 they do not change so rapidly that a short delay necessarily would
 invalidate a test result").

 ¶ 25. Further, a flexible rule is consistent with the protections we
 have previously afforded defendants in this context. In Welch, we imposed
 a limited right to counsel to aid the operator in making the decision
 whether to take the test because of the serious consequences of the
 decision. 135 Vt. at 321-22, 376 A.2d at 355. We were aware that
 consultation with counsel would delay the decision whether to take the test
 and required access to counsel only when "such access is requested and is
 readily available and will not interfere with investigation of the matter
 at hand." Id. at 322, 376 A.2d at 355. As discussed above, we amplified
 the right created in Welch in Duff, 136 Vt. at 540, 394 A.2d at 1147,
 calling the evidentiary-test decision faced by the operator "complicated." 

 ¶ 26. Additionally, we are not persuaded by the second rationale of
 the "absolute" jurisdictions - that allowing a defendant's subsequent
 consent to cure his initial refusal will require officers to "turn aside
 from their other responsibilities and arrange for the administration of a
 belated test." Zidell, 264 Cal. App. 2d at 870. Again, the statutory time
 limit answers much of the concern. The statute expressly affords
 defendants "a reasonable amount of time to decide whether to submit to the
 breath test, but no longer than thirty minutes after the first attempt to
 contact an attorney," Benware, 165 Vt. at 632, 686 A.2d at 479 (citing 23
 V.S.A. § 1202(c)), so officers are already required to wait up to thirty
 minutes. We can require that any reconsideration occur within a reasonable
 time and within the statutory time limit of thirty minutes. As the cases
 before us show, it is unlikely that allowing reconsideration of a refusal
 will divert officers from other activities for any significant amount of
 time.
 
 ¶ 27. The cases before us demonstrate another reason to adopt the
 flexible rule. Not surprisingly, the quality of the communication between
 the officer and the probably-intoxicated operator was not optimum in either
 case, and in both cases the operator claimed that he did not refuse to take
 the test. Thus, were we to adopt the absolute rule, trial courts like the
 one in Bonvie would be left with the mind-reading exercise of determining
 if a defendant refused based on communications like the following:
 
 Officer: "Will you give me a sample of your breath as evidence?" 
 Defendant Bonvie: "My lawyer told me not to answer any questions." 
 Officer: "Well, are you going to provide a sample of your breath?" 
 Defendant Bonvie: "I guess no." 
 The officer: "Is that a no?" 
 Defendant: "No." 

 In some cases, that exercise is unavoidable. But in many, including those
 before us, the opportunity for the operator to reconsider his answer when
 the officer's interpretation of his words becomes apparent to him obviates
 the need for difficult, case-by-case interpretations of vague, inconclusive
 verbal exchanges. 

 ¶ 28. We emphasize that we are not holding that the police must wait
 thirty minutes after counsel is contacted in the event that the operator
 decides to reconsider his refusal. See Standish, 683 P.2d at 1280 ("The
 arresting officer need not sit and wait for the person to change his or her
 mind, and thus neglect other duties"). That position was necessarily
 rejected in Stockwell, and, again, we see no reason to reconsider that
 decision here. We also reaffirm our conclusion in Stockwell that officers
 may find refusal to the test based on an abusive and assaultive response to
 a request to take it, and they need not indulge the operator for thirty
 minutes in the absence of any indication he intends to be cooperative. 
 Stockwell, 143 Vt. at 51, 460 A.2d at 469. 
 
 ¶ 29. The Windham District Court in Gilbeau adopted the standards
 for determining the effectiveness of a reconsidered decision to take the
 test as set out in Standish, 683 P.2d at 1280. On review, we agree with
 that adoption subject to two modifications. The first is that the initial
 factor - the timeliness of the defendant's subsequent consent - is
 controlled by the reasonableness standard and thirty-minute window of 23
 V.S.A. § 1202(c). We confirm what the language of § 1202(c) clearly
 states: a test is timely if made "within a reasonable time" and no later
 than thirty minutes. Id. We also modify the fifth factor regarding the
 continuous custody and observation of the defendant by the officer as
 discussed below. These standards reflect a fair balance of the
 considerations applicable on the issue before us.

 ¶ 30. In general, we are dealing with cases in which the allowance
 of reconsidered consent is reasonable because the reconsideration occurred
 during the initial processing when the operator learned that his words were
 interpreted as a refusal and understood the consequences of that refusal. 
 Thus, the Windham District Court found that defendant Gilbeau's
 post-refusal consent was effective under the Standish factors, and the
 State has not contested that analysis. We affirm in Gilbeau on that basis.

 ¶ 31. The Caledonia District Court did not apply the Standish
 factors to defendant Bonvie, and ordinarily we would remand for that
 analysis. The court did, however, make findings of fact outlined below,
 and we conclude under those findings that the Standish standards were met
 as a matter of law. Thus, we also affirm in Bonvie. 

 ¶ 32. The findings in Bonvie were as follows:
 
 The court finds based on the evidence that defendant changed his
 mind in good faith and was not attempting to procrastinate in the
 hopes of improving the test result. Defendant's response to the
 officer's initial question about taking the test indicates that he
 was confused by the advice he received from his attorney. He
 appears to have equated his attorney's advice not to answer
 questions with a decision to say "no" when the officer asked him
 if he would provide a sample of his breath. Although the officer
 had informed him that the suspension would be six months if he
 refused the test, he appears not to have really absorbed this
 information until the officer handed him paperwork that said his
 license would be suspended for six months.

 23 V.S.A. § 1202(c) provides that a person must decide whether or
 not to submit to the evidentiary test "within a reasonable time
 and no later than 30 minutes from the time of the initial attempt
 to contact the attorney." 23 V.S.A. § 1202(c). The initial
 attempt in this case to contact an attorney was made at 1:14 a.m.
 by the officer's watch. The officer testified that he concluded
 the processing at 1:53 a.m. He further testified that the
 defendant changed his mind and asked to take the test about 10
 minutes before that or at 1:43 a.m. Defendant's change of mind
 was thus timely, made just barely within the 30 minute period
 following the initial attempt to contact an attorney.

 In its analysis, the court added that "defendant and the officer were both
 still in the processing room" and that "[t]he Datamaster machine was in the
 room ready to be used and it would have taken very little additional time
 to allow defendant to take the test." 

 ¶ 33. As we stated above, compliance with the first Standish factor
 is measured by compliance with 23 V.S.A. § 1202(c). The court found such
 compliance, and its conclusion is supported by the evidence. 
 
 ¶ 34. As to the second factor, the court found that defendant
 consented to take the test one hour and twenty minutes after he was stopped
 by th police, and so "the test would have been within the two hour
 presumptive framework." Although the court did not identify when the
 initial refusal was made, the evidence indicates that it occurred around
 1:30 a.m., so that approximately thirteen minutes elapsed between the
 refusal and the consent at 1:43 a.m. The State has not contended that the
 second factor - that a test administered upon the subsequent consent would
 still be accurate - is not met. In the absence of any evidence to the
 contrary, we assume, consistent with past relation-back cases, that it was. 
 See, e.g., Gray, 150 Vt. at 187, 552 A.2d at 1192 (finding test taken
 "nearly two hours after the operation of the vehicle" admissible where
 results appropriately related back by an expert). The additional thirteen
 minutes would not turn a valid test result into an invalid one. We note
 that the decisions in other flexible-rule jurisdictions overwhelmingly
 allow reconsidered consent where the refusal was less than twenty minutes
 before the consent. See J. Purver, Annotation, Driving While Intoxicated:
 Subsequent Consent to Sobriety Test as Affecting Initial Refusal, 28
 A.L.R.5th 459, § 8 (2007).

 ¶ 35. On the third factor, the court found that the testing
 equipment was still readily available, and this finding is uncontested. 
 Similarly, the fourth factor is clearly met because the officer had not
 completed the processing when defendant consented, and there is no evidence
 of substantial inconvenience or added expense. 
 
 ¶ 36. Finally, we believe the fifth factor - that the individual
 requesting the test has been in the custody of the arresting officer and
 under observation for the whole time since arrest - is met sufficiently in
 this case. We note that in Standish, the Kansas Supreme Court required a
 defendant to have been under the arresting officer's "observation for the
 whole time since arrest." 683 A.2d at 1280. In defendant Bonvie's case,
 the trial judge noted that defendant spoke to his attorney outside of the
 presence of the arresting officer, and defendant was apparently left alone
 in a police room to make this call. There is no allegation that he was
 ever out of police custody or that he left the station prior to his request
 to take the test. We find these facts sufficient to meet the fifth
 Standish factor. We have held that a defendant's conversation with a
 lawyer must be "reasonably private." State v. Sherwood, 174 Vt. 27, 31,
 800 A.2d 463, 466 (2002). Our concern that defendant be continuously
 observed relates particularly to the period between the refusal and the
 consent. Such observation is sufficient to ensure that nothing occurs in
 that period that would make the test result less accurate than it would
 have been had defendant consented initially. Thus, we do not require that
 the officer continuously observe the operator during the consultation with
 the lawyer. Nor are we concerned about continuous observation before the
 lawyer consultation unless there is some reason to believe that events
 during that period made the delay in giving consent more significant. To
 that extent, we modify the fifth Standish factor. 


 ¶ 37. Ultimately, the defendant in each case exhibited a good-faith
 change of mind to take the test before the thirty-minute period provided in
 23 V.S.A. § 1202(c) had expired, and each of the factors outlined in
 Standish, 683 P.2d at 1280, were met as discussed above. Defendants'
 subsequent consent to take the test in each case was, therefore, valid
 under our implied-consent statute. 

 The judgment in each case is affirmed. 
 


 FOR THE COURT:



 _______________________________________
 Associate Justice


------------------------------------------------------------------------------
 Footnotes


FN1. Although it is disputed whether defendant Gilbeau was merely confused
 and did not in fact refuse in the first place, or whether he changed his
 mind in later agreeing to take the test, this is a distinction without a
 difference in light of our holding. Consent, if made within the
 thirty-minute window, is effective consent whether it occurs after a change
 of heart or not. We assume, arguendo, that both defendants "refused" to
 take the test at first.

FN2. Section 1202(d)(4) requires that the operator be informed of the
 provisions of § 1202(c). It codifies our holding in State v. Duff that a
 previous version of Vermont's implied-consent law implicitly required
 individuals stopped for DUI to be informed of their statutory right to
 consult with an attorney before deciding whether to take the breath test. 
 136 Vt. 537, 539, 394 A.2d 1145, 1146 (1978). Similarly, the right to
 consult with an attorney in this context was first provided by this Court
 in State v. Welch, 135 Vt. 316, 318, 322, 376 A.2d 351, 352 (1977), before
 it was codified in what is now § 1202(c).